IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DEREK L. MOORER,
Plaintiff,

vs. Case No. 3:11cv397/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
Defendant.
_______________________________/

**REPORT AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I. PROCEDURAL HISTORY

On January 11, 2007, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning January 4, 2005, although he later amended his alleged onset date

to December 10, 2006 (Tr. 17).[1] Plaintiff's applications were denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ"). A hearing was held on February 2, 2010, and on February 25, 2010, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (Tr. 17–25). The Appeals Council subsequently denied Plaintiff's request for review (*see* Tr. 1). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II. FINDINGS OF THE ALJ

In her decision dated February 25, 2010, the ALJ made the following findings relative to the issues raised in this appeal (*see* Tr. 17–25):

1) Plaintiff meets the insured status requirements of the Act through June 30, 2010.[2]

2) Plaintiff has not engaged in substantial gainful activity since December 10, 2006.

3) Plaintiff has the following severe impairments: status post thoracic and cervical fractures and chronic back pain, status post bilateral scapular fracture with chronic right shoulder pain and impingement, and chronic left hip pain.

4) Plaintiff has no impairment or combination of impairments that meets or medically equals a listed impairment.

5) Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with certain exceptions (as discussed more fully *infra*).

6) Plaintiff cannot perform any past relevant work, but he can perform other work available in the national economy and, therefore, is not disabled.

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on November 16, 2011 (Doc. 11). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

[2] Thus, the time frame relevant to this appeal is December 10, 2006, the alleged onset date, to February 25, 2010, the date of ALJ's decision.

legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV. PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

### A. Personal History

Plaintiff was born on July 13, 1977, and thus was twenty-nine years of age on the date he alleges he became disabled (Tr. 36). He has a high school education and past relevant work as a stocker, reamer, utility helper, buffer, and roofing helper, which work he performed at "light" to "very heavy" levels of exertion (Tr. 23).

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

On January 4, 2005, Plaintiff was injured at work and complained of back pain (Tr. 21). Approximately four months later he underwent a functional capacities evaluation, which resulted in a determination that Plaintiff could return to work and work at a medium level of exertion (Tr. 21, 304). Plaintiff thus returned to work in mid-May 2005, and he continued working until November 20, 2006 (Tr. 209–10, 224–25). On December 10, 2006, he was involved in a motor vehicle accident ("MVA"), and his DIB and SSI claims are based on injuries sustained in the MVA (*see* Tr. 21).

B.      Relevant History Regarding Medical Treatment and Prescription Medications

Plaintiff saw Raymond R. Fletcher, M.D., an orthopedic surgeon, on twelve occasions between February 2005 and July 2006 for treatment related to his January 2005 work injury and associated workers' compensation claim (*see* Tr. 378–82). Dr. Fletcher's treatment records reflect that Plaintiff was prescribed various medications, including Davocet, Skelaxin, Lortab, and Flexeril (*see, e.g.*, Tr. 379); they further reflect that Plaintiff reported no side effects from any of his prescribed medications (*see* Tr. 378–82). Plaintiff also presented to an emergency room ("ER") four times while under Dr. Fletcher's care. On March 6, 2005, Plaintiff presented with complaints of back pain and reported he had run out of his prescribed pain medications (Tr. 453). ER staff discharged Plaintiff with a prescription for tramadol and recommended that he obtain followup treatment (presumably with Dr. Fletcher) (Tr. 456). Plaintiff made similar complaints at an ER visit on June 20, 2005, and stated he had run out of Lortab and Darvocet (Tr. 447, 449). He was released with prescriptions for Ultracet, Flexeril, and Naprosyn and advised to followup with Dr. Fletcher (Tr. 450). Plaintiff returned with complaints of back pain on October 13, 2005, and was released by ER staff with prescriptions for Naprosyn and Ultracet (Tr. 445). Finally, on April 6, 2006, Plaintiff again presented to the ER with complaints of back pain (Tr. 430). Upon discharge, Plaintiff was advised to take over-the-counter Motrin, Advil, or Tylenol, as the attending physician did not feel comfortable prescribing narcotic pain medications, and to follow up with Dr. Fletcher if he wished to obtain such medications (*see* Tr. 430–31).

Plaintiff was admitted to West Florida Hospital on December 10, 2006, following a single-vehicle MVA in which Plaintiff was ejected from the vehicle (Tr. 384). Upon admission, Plaintiff was assessed with spinal, rib, and bilateral shoulder injuries/fractures, but no surgical procedures

were recommended (or performed) during his hospitalization (*see* Tr. 385, 386, 389). Plaintiff was discharged on December 18, 2006, with a prescription for Percocet for pain and instructions to follow up in one week (Tr. 385).

On January 10, 2007, Plaintiff presented to Mark T. Caylor, M.D., an orthopedic surgeon, for "followup of bilateral scapula fractures" (Tr. 405). Plaintiff was using a right arm sling, and he reported that any activity with the right arm caused increased pain (*id.*). Plaintiff was assessed with bilateral scapula fractures, prescribed Lortab (strength unknown) to be taken once every three to four hours, instructed to begin full range of motion activities with the left arm and more-limited range of motion activities with the right arm, and advised to return to Dr. Caylor "as directed" (*id.*). Plaintiff returned on January 31, 2007, and Dr. Caylor advised Plaintiff to "continue to advance up his activity with range of motion of bilateral arms," and he restricted Plaintiff from "heavy lifting, pulling [and] pushing" (Tr. 406). Dr. Caylor prescribed forty, Lortab 5mg tablets, to be taken in one to two-tablet quantities every six to eight hours, with no refills, and he advised Plaintiff to return in two weeks (*id.*).[4]

Plaintiff returned to the ER in February and June 2007, with complaints of flu-like symptoms (*see* Tr. 407, 410, 507). At the February visit, a physical examination revealed normal ranges of motion in Plaintiff's extremities (Tr. 411). Plaintiff was assessed with acute viral syndrome and acute bronchitis and discharged with instructions to rest and increase fluid intake (*see* Tr. 411, 416). At the June visit, a physical examination was normal in all areas tested, including the back, neck, and all extremities (Tr. 506).

On a disability form dated August 15, 2007, Plaintiff reported that he took no medications and, correspondingly, had no medication side effects (Tr. 268, 270). On another disability form completed in or about February 2009, Plaintiff reported that took meloxicam (an anti-inflammatory),

[4] On January 23, 2007, Plaintiff reported on a form submitted in connection with his claims for DIB and SSI that Lortab "ma[de] him fall asleep," although he made no such report to Dr. Caylor (Tr. 240, 405–06; *see also* Tr. 255, 257 (Plaintiff's report on another disability form, dated April 27, 2007, that Lortab (and Flexeril) made him "sleepy")).

citalopram (an anti-depressant) and tramadol (a pain reliever), since January 20, 2009, as well as Naprosyn (an anti-inflammatory/pain reliever), since June 9, 2008 (Tr. 280).[5]

Plaintiff again presented to the ER in June 2008 and March 2009, with complaints of back pain, right shoulder pain, right chest pain, and/or left hip pain (Tr. 488, 497). Examinations of the shoulder revealed some tenderness and decreased ranges of motion, but all other areas tested were normal, including the neck and back, except during the June 2008 visit when some tenderness in the right lateral chest area was detected (*see* Tr. 488–90, 498, 500).

    C.    Consultative Examinations

On March 26, 2007, Plaintiff underwent a consultative examination by Michael E. Kasabian, D.O. (Tr. 458–62). Dr. Kasabian described Plaintiff's neck as "supple" but noted the existence of some muscle spasm and right-sided neck tenderness (Tr. 458). Plaintiff's ribs were tender on both sides, as were his left knee and right shoulder with range of motion testing (*id.*). Range of motion in the right shoulder was limited due to pain (*id.*). Fine grip dexterity was normal, muscle strength was full ("5/5"), Plaintiff held foreign objects without difficulty, and he could "take[] shoes and socks off and put[] them back on" and stand on his heels and toes (Tr. 458–59). Straight leg raising tests were negative, bilaterally, in both sitting and supine positions, although some lumbar tenderness was detected and a "little bit of muscle spasm [was] noted bilaterally [in the] L4-5 paravertebral musculature" (Tr. 459). Finally, Plaintiff walked without a limp or assistive device, and no muscle atrophy or asymmetry was noted (*id.*). Dr. Kasabian assessed low back pain, history of multiple trauma, fractured ribs, "fractured collar bones but apparently they were acromion fractures," left knee pain, and limited range of motion in the neck possibly due to cervical strain (*id.*). Dr. Kasabian completed a Range of Motion Report Form, that reflects normal ranges of motion in the elbows, wrists, hands, hips, knees, ankles, and toes, and some limited range of motion in the right shoulder and right cervical and lumbar spine (*see* Tr. 460–62).[6]

---

[5] On an undated medication form, presumably created prior to the form from February 2009, Plaintiff reported taking similar medications and noted they were prescribed in 2007 by "Dr. Bachman" (Tr. 284). He also reported taking Lortab 7.5 mg, and stated it had been prescribed in 2007 by Dr. Bachman (Tr. 284; *see also* Tr. 288 (undated report by Plaintiff that Lortab 7.5 mg had been prescribed since December 2006 by Dr. Bachman, as well as "Dr. Samson" and "Dr. Spencer")).

[6] Dr. Kasabian did not complete a physical capacities assessment or otherwise provide an opinion regarding the existence or extent of work-related limitations.

Plaintiff was examined by Leo Chen, M.D., an orthopedic surgeon, on September 10, 2009 (Tr. 523–34). Plaintiff reported diffuse back and neck pain, right shoulder pain, and left hip pain (Tr. 523). He stated that the hip pain was attributable to his on-the-job injury, and that the remaining pain was attributable to injuries sustained in the MVA (*id.*). Plaintiff claimed that the right shoulder pain was his "greatest complaint" (*id.*). Dr. Chen reviewed spinal x-rays, which revealed mild degenerative changes and degenerative joint disease in the cervical spine, especially at C-6 and C-7, with a slight loss of lordosis; mild degenerative changes in the thoracic spine, with "some old healed fractures of his transverse processes on the right"; and mild degenerative changes in the lumbar spine, with no acute bony injuries (Tr. 524). X-rays of the right shoulder revealed degenerative changes in the acromioclavicular joint, an interior spur around the acromion, and a slightly abnormal scapula consistent with a possible healed fracture (*id.*). Additionally, x-rays of the left hip revealed minimal degenerative changes, with no acute bony injuries (*id.*). A physical examination revealed full range of motion in the cervical spine, lumbar spine, elbows, wrists, hands, knees, ankles and neck, but "some loss of range of motion" in the right shoulder, as well as "some crepitus" and signs of impingement in the right shoulder (Tr. 524, 526–27). Additionally, Plaintiff displayed some weakness with abduction of the right shoulder (i.e., 0-130° out of a possible range of 0-150°) (Tr. 524, 526). The right shoulder, however, displayed "no gross instability," and the remainder of the right arm was "non-focal with pulses 2+ and symmetric to the other side"; additionally, sensation was grossly intact throughout all extremities, reflexes were symmetrical, and toes were downgoing (Tr. 524). Finally, Plaintiff could toe, heel, and tandem walk without an assistive device but displayed a slight antalgic gait on the left (*id.*). Dr. Chen's diagnostic impressions were chronic back pain secondary to healed thoracic and cervical fractures, chronic right shoulder pain and impingement status post healed bilateral scapular fractures, and chronic left hip pain (Tr. 525). Dr. Chen opined that Plaintiff had no mental or environmental work-related restrictions, "but his ability to perform physical work may be somewhat limited . . . [as] delineated on the capacity form" (*id.*). The "capacity form" reflects the following opinions as to Plaintiff's work-related abilities: (1) frequently lift or carry up to ten pounds and occasionally lift or carry up to twenty pounds; (2) sit thirty minutes at a time, for a total of three hours in an eight-hour workday; (3) stand thirty minutes at a time, for a total of two hours in an eight-hour workday; and (4) walk an hour at a time, for a total of three hours in an eight-hour workday (Tr. 529–30). Dr. Chen also

opined that Plaintiff had no restrictions related to the use of his feet, left hand, or in performing various daily activities, and that he was restricted on the right only with regard to overhead reaching, which should be limited to "occasional" (*see* Tr. 531, 534).

D. Relevant Hearing Testimony

On February 2, 2010, Plaintiff appeared with counsel for his hearing before the ALJ. He testified he took "Lortab 7.5," as prescribed by a "Dr. Simpson" with the Pensacola Clinic (Tr. 37–38). He stated Dr. Simpson had treated him for eight to nine months, "every three to four months" (Tr. 38, 41). He testified that Dr. Simpson also prescribed Mobic, Flexeril, and Bactrim (Tr. 37). Plaintiff noted that he went to a hospital, approximately once every five months, for a Demerol shot (Tr. 41–42). He stated the shot is "the only way [his] medications help," and if he does not have the shot "in his system" his pain is not eased (Tr. 42). Finally, Plaintiff testified that his medications make him nauseated, drowsy,"put him to sleep," and/or cause hot flashes (Tr. 38, 40).

V. DISCUSSION

Plaintiff raises two issues in this appeal, arguing first that the ALJ erred in determining his RFC (Doc. 13 at 1, 5–11). He secondly argues that the ALJ erred in failing to consider his testimony regarding medication side effects (*id.* at 1, 11–16). The Commissioner contends the ALJ determined Plaintiff's RFC, evaluated his credibility, and considered his claims for DIB and SSI in accordance with applicable statutes and regulations, and further, that the Commissioner's final decision is supported by substantial evidence on the record as a whole and should be affirmed (*see* Doc. 16).

A. Residual Functional Capacity Determination

The ALJ determined the following RFC:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) [("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.")], except [Plaintiff] can occasionally lift and carry up to twenty pounds and frequently lift and carry up to ten pounds. *He can sit for eight hours out of eight, stand for two hours out of eight, and walk for three hours out of eight*. He can occasionally use his right hand for overhead reaching and he

> can continuously use his right hand for all other reaching, handling, fingering, feeling, pushing or pulling. He can continuously use his left hand for all activities. He can continuously use both feet for operation of foot controls. He can occasionally climb ladders or scaffolds, stoop, kneel, crouch, or crawl, and he can never operate a motor vehicle.

(Tr. 20) (emphasis added). The foregoing RFC is fully consistent with and fully incorporates all of Dr. Chen's opinions, except for the italicized portion, which is inconsistent with Dr. Chen's opinion that Plaintiff can sit only three hours in a workday. Plaintiff asserts error based on this inconsistency.

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence (that is, evidence from medical reports or sources); rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding); *see also* 20 C.F.R. § 404.1545 (RFC is assessed "based on all the relevant evidence in [the] case record").

Here, to the extent Plaintiff contends that in determining his RFC the ALJ was required to choose the opinion of a particular physician, such as Dr. Chen, the contention is unavailing. *See, e.g.*, Schmidt v. Apfel, 496 F.3d 833, 845 (7th Cir. 2007) (holding that in determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of the claimant's physicians"). Likewise, the ALJ did not have to accept Dr. Chen's

sitting restriction merely because no other physician specifically addressed Plaintiff's sitting capacities, as Plaintiff suggests (*see* Doc. 13 at 8–10). As the Tenth Circuit very recently noted:

> [T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004) (following 20 C.F.R. § 416.927(e)(2) and SSR 96–59, 1996 WL 374183, at *5); *see also* 20 C.F.R. §§ 404.1546(c) and 416.946(c). We have thus "rejected [the] argument that there must be specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category." Howard, 379 F.3d at 949; *see, e.g.*, Wall, 561 F.3d at 1068–69 (upholding ALJ's findings on mental impairment where record did not contain any treating or examining medical opinions as to allegedly disabling pain disorder); Bernal v. Bowen, 851 F.2d 297, 302–03 (10th Cir. 1988) (holding ALJ properly made mental RFC findings without expert medical assistance).

Chapo v. Astrue, 2012 WL 2384354, at *2 (10th Cir. June 26, 2012) (footnote omitted). *See also* Poke v. Astrue, No. 1:10CV768-CSC, 2012 WL 174472, at *4 n.10 (M.D. Ala. Jan. 23, 2012) ("[T]he court disagrees to the extent that these cases suggest that the fourth-step [RFC] determination must be based on a medical source evaluation. Nation v. Barnhard, 153 F. App'x 597 (11th Cir. 2005), does not hold that an ALJ must secure an [RFC] assessment from a medical source . . . [t]he court [in Nation] held that the record contained sufficient other evidence from which the ALJ could reach his conclusion."). Thus, as previously discussed, an ALJ must develop the RFC based on the entire record, not the opinion of one physician. Here, the ALJ did as she was required to do.

In determining Plaintiff's RFC the ALJ considered among other factors his credibility, Dr. Kasabian's examination in May 2007 (which yielded essentially normal results except for some neck, left knee, and right shoulder tenderness, as well as limited ranges of motion in the right shoulder and right cervical and lumbar spine), x-ray findings (as interpreted by Dr. Chen, which generally included mild or minimal degenerative spinal changes or joint disease, and healed fractures with no acute bony injuries), and Dr. Chen's examination in September 2009 (which yielded essentially normal results, except with regard to the right shoulder) (Tr. 20–22). The ALJ also considered that Plaintiff's daily activities and failure to obtain regular treatment are inconsistent with Dr. Chen's restrictive opinion. *See* Social Security Ruling (SSR) 96-8p (eff. July 2, 1996)

(RFC is assessed based on all relevant evidence of record, including reports of daily activities and frequency or duration of medical treatment). Further, the ALJ took into account her personal observation of Plaintiff's ability to sit longer than thirty minutes at his hearing. *Id.* ("In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations.") (emphasis in original).[7]

The ALJ also acknowledged that Plaintiff's RFC is inconsistent with Dr. Chen's opinions, but she explained:

> [L]ess weight was given to the portion of Dr. Chen's opinion that would imply a sit/stand occupational option would be required by stating that [Plaintiff] can only sit for thirty minutes at a time, stand for thirty minutes at a time and walk for one hour at a time because these particular limitations are not supported by the medical evidence in the record. Dr. Chen also limits [Plaintiff's] ability to sit to three hours out of eight, but there is no supportive medical evidence suggesting that [Plaintiff] could not sit for eight hours out of eight. For instance, none of [Plaintiff's] treating physicians gave [him] any restrictions at all after the car accident (All Exhibits). Moreover, [Plaintiff] testified at the hearing that he can walk down the street to visit his cousins and he told Dr. Brown [Ph.D.] during a consultative [psychological] examination that he goes down the street to watch other people play ball in "pick-up" games (Hearing Testimony and [Tr. 468]). He also told Dr. Brown that he can only stand or walk for thirty minutes at a time; however, it should be noted that the hearing in this case lasted thirty five minutes with [Plaintiff] in a seated position ([Tr. 468]). He told Dr. Brown that he sits on his front porch during the day and watches crime dramas on television ([Tr. 468]). The State agency examining physician pointed out that [Plaintiff] stated that he performs all of his daily chores, but in moderation due to pain ([Tr. 484]). [Dr. Kasabian's] [e]xamination[] showed that [Plaintiff] had a normal gait and was able to take his socks and shoes off without difficulty ([Tr. 458–59]).
>
> * * *
>
> In making [the RFC and credibility] determination[s], the undersigned [ALJ] considered all the evidence of record as well as [Plaintiff's] allegations and activities of daily living. In short, [Plaintiff's] allegations are not entirely credible because he has not received the type of consistent medical treatment that would be expected for a totally disabled individual. Moreover, the doctors that have provided treatment for [Plaintiff] have not assigned any restrictions . . . (All Exhibits). [Dr. Chen] has

[7] Plaintiff relies upon Freeman v. Schweiker, 681 F.2d 727 (11th Cir. 1982), to assert that the ALJ "cannot substitute his or her judgment of a claimant's condition for that of the medical and vocational experts" (Doc. 13 at 10). This is true, but inapplicable here, as the ALJ in Freeman erroneously crafted an RFC by relying solely on the claimant's appearance during the hearing (a practice condemned as "sit and squirm" jurisprudence). Freeman, 681 F.2d at 730.

       > agreed with the [RFC determination] with the exception of the length of time [Plaintiff] is able to sit. After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause some symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above RFC assessment.

(Tr. 22, 22–23).

Based on the foregoing, it is evident that the ALJ considered the entire record in determining Plaintiff's RFC and, correspondingly, in rejecting one of Dr. Chen's opinions. Although Dr. Kasabian articulated no specific functional limitations, as Plaintiff notes (*see* Doc. 13 at 6, 9), the ALJ referenced Dr. Kasabian's examination in determining Plaintiff's RFC, and she noted that his examination was unremarkable in the aspects relevant to this claim (*see* Tr. 21). The ALJ thus concluded that Dr. Chen's sitting restriction is inconsistent with the results of Dr. Kasabian's examination (it is also inconsistent with the results of Dr. Chen's own examination of Plaintiff). Moreover, the ALJ specifically noted the opinion of Clarence Louis, M.D., a non-examining agency physician, who—after reviewing Dr. Kasabian's report (as well as other evidence of record)—opined that Plaintiff's impairments did not affect his ability to function (*see* Tr. 22 (referencing "Exhibit 17F," which is Dr. Louis' "Case Analysis" at Tr. 484)). Additionally, the ALJ correctly noted that no treating physician imposed any functional limitations following Plaintiff's MVA (Tr. 23), much less any restrictions related to Plaintiff's ability to sit. Likewise, Plaintiff did not complain to any treating physician of sitting-related pain or limitations, and the record suggests he had no such limitations.[8]

Finally, the Vocational Expert ("VE") testified at Plaintiff's hearing that, with the RFC determined by the ALJ, Plaintiff could perform three sedentary jobs: (1) production assembler (with nearly 290,000 jobs available nationally and nearly 8000 in Florida); circuit board assembler (nearly 475,000 available nationally and approximately 30,000 in Florida); and bonder/semiconductor of electric components (nearly 50,000 available nationally and approximately 1,600 in Florida) (Tr. 43–44). Following this testimony the VE was asked to consider Dr. Chen's

[8] For example, Plaintiff reported he could not sleep in a bed because he cannot lie on his back; thus, he sleeps "sitting in a recliner" (Tr. 242), and he testified that during most days he "sit[s] at home" and reclines on the couch (Tr. 38).

opinions. The VE first noted that Dr. Chen's capacity form was confusing (Tr. 46). She explained that the capacities listed for sitting (three hours), standing (two hours), and walking (three hours) in a workday total eight hours, thereby indicating a belief by Dr. Chen that Plaintiff is capable of working an eight-hour day (*see* Tr. 46, 530). The VE noted, however, that the various capacities are "really not consistent with any full range of any exertional level" (Tr. 46). Notwithstanding, the VE testified, even if Plaintiff has the capacities indicated by Dr. Chen he "should be able to perform the [three sedentary] jobs" she previously identified because those jobs can be performed either sitting or standing, although the need to alternate sitting and standing might "in all fairness" reduce the available jobs by about 50% (Tr. 45–46). The VE's testimony thus demonstrates that Plaintiff can perform the sedentary jobs she identified, with the RFC determined by the ALJ or with the restrictions imposed by Dr. Chen, albeit at a reduced number with regard to the latter hypothetical scenario. Given the number of the available sedentary jobs identified by the VE, sufficient numbers remain even if Dr. Chen's opinions are fully considered and, thus, any error in discounting the most restrictive opinion of Dr. Chen is harmless. *See, e.g.*, Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . ."); *see also* 42 U.S.C. § 423(d)(2)(A) (an individual is disabled only if his impairments are of such severity that he is not only unable to do his previous work but cannot engage in any other kind of substantial gainful work which exists in the national economy (that is, "work which exists in significant numbers either in the region where such individual lives or in several regions of the country")). As few as 174 jobs has been held to be significant, *see* Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987), and it appears to be well-established that 1,000 jobs is a significant number. *See, e.g.*, Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993); *see also* Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs); Barker v. Sec. of Health & Human Servs., 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs); Trimiar v. Sullivan, 966 F.2d 1326, 1330–32 (10th Cir. 1992) (850–1,000 jobs); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs).

In sum, the ALJ did not err in including most, but not all, of Dr. Chen's opinions in the RFC or in relying on the VE's opinion that Plaintiff could perform various jobs at the sedentary exertional level—the least strenuous exertional level—with the RFC determined by the ALJ. As the VE noted,

Dr. Chen did not opine that Plaintiff could not work; indeed, his opinions can only be construed as suggesting Plaintiff could work and could do so for eight hours a day. *See* Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) ("A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments."). Moreover, even if the ALJ erred, the error was harmless because significant numbers of jobs remain available even taking into account all of Dr. Chen's opinions. Thus, Plaintiff is not entitled to relief on this claim.

B. Complaints of Medication Side Effects

As can be seen *supra*, the ALJ discounted Plaintiff's allegations of disabling limitations based upon a variety of factors. The ALJ, however, failed to specifically mention or discount Plaintiff's complaints regarding medication side effects. Her failure to do so, Plaintiff contends, requires that this case be remanded "to the Commissioner for further proceedings to include proper consideration of how [Plaintiff's] medication side effects limit him from performing work-related tasks on a regular and sustained basis" (Doc. 13 at 16).

(1) Development of the Record as to Medication Side Effects

The ALJ has a basic duty to develop a full and fair record; however, the claimant bears the burden of proving disability and is responsible for producing evidence in support of his claim. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003). The Eleventh Circuit has clarified that where a represented claimant's testimony raises a question as to the side effects of medications, but he does not otherwise allege that the side effects contribute to the alleged disability, the ALJ does not err in failing to inquire further into possible side effects. Pilnick v. Comm'r of Soc. Sec., No. 07–11789, 2007 WL 3122168, at *1 (11th Cir. Oct. 26, 2007) (citing Cherry v. Heckler, 760 F.2d 1186, 1191 n.7 (11th Cir. 1985)); Colon ex rel. Colon v. Comm'r of Soc. Sec., 411 F. App'x 236, 238 (11th Cir. 2011) ("While Mr. Colon had reported some side effects from his medications in a disability report and his lawyer had given the ALJ a list of Mr. Colon's medications and their side effects, Mr. Colon did not mention his medication side effects in response to the ALJ's questions about why he could not return to work. Because Mr. Colon was represented at his hearing, the ALJ was not required to inquire further into Mr. Colon's alleged side effects . . . ").[9] *Cf.* Cowart v.

[9] In Colon, unlike the case at bar, the ALJ specifically discredited Mr. Colon's complaints relating to medications side-effects. Colon, 411 F. App'x at 238.

Schweiker, 662 F.2d 731, 735–37 (11th Cir. 1981) (where an unrepresented claimant's hearing testimony raises a question as to the side effects of medications, an ALJ has a special duty to elicit further testimony or otherwise make a finding regarding such side-effects). Here, although Plaintiff self-reported medication side effects in connection with his claim for DIB and SSI, neither he nor his counsel alleged that Plaintiff was disabled or otherwise unable to perform work due to medication side effects (*see, e.g.*, Tr. 224 (Plaintiff's report that he is disabled due to lower back and shoulder blade injuries); *see also* Tr. 291–93 (counsel's letter to the appeals counsel, alleging error by the ALJ as to her RFC determination and credibility finding but making no mention of a claim related to medication side effects)). Thus, it is clear the ALJ did not err by failing to develop the record as to this represented Plaintiff's alleged medication side effects.

(2)  Plaintiff's Burden of Proof and Production of Evidence

It is equally clear that Plaintiff failed to satisfy his burden to prove that medication side effects rendered him unable to work or his burden to produce evidence in support of such a claim. *See* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) ("the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim"); 20 C.F.R. § 416.912(a) (stating that "[claimant] must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)").

Initially, Plaintiff presented no evidence establishing that he actually was prescribed Lortab (or any other controlled substance) on a long-term or continuous basis during the time frame relevant to this appeal (December 10, 2006, and February 25, 2010). As fully detailed *supra*, Plaintiff saw Dr. Caylor in January 2007, and Dr. Caylor prescribed limited quantities of Lortab (including a prescription for Lortab at Plaintiff's last visit on January 31, 2007, that specifically stated "no refills"). Although Plaintiff reported in June 2007 to Dr. Brown, a psychologist who interviewed him in connection with his disability claims, that he was taking Lortab and that it made him drowsy, Plaintiff did not identify the doctor who prescribed the Lortab, and there are no records in the file substantiating Plaintiff's report that he was prescribed Lortab in or near June 2007 (as noted above, ER staff did not prescribe narcotic pain relievers and advised Plaintiff that such prescriptions would have to be obtained from his personal physician). Indeed, just two months later—in August

2007—Plaintiff reported on a disability form that he took no medications whatsoever.[10] Additionally, in or about February 2009, Plaintiff reported that he took meloxicam, citalopram, tramadol, and Naprosyn, but he did not list Lortab (or other, similar narcotic pain medications), and there are no treatment records documenting prescriptions for the various medications he did list. Likewise, although Plaintiff testified in February 2010 that he was taking Lortab and other medications prescribed by Dr. Simpson (with the Pensacola Clinic, where Plaintiff supposedly had been treated for the previous eight to nine months), there are no records in the file from the Pensacola Clinic, a "Dr. Simpson," or any other medical source documenting prescriptions for Lortab or any other medications in February 2010 or for the preceding eight to nine months.

Moreover, the few treatment records that do exist contain no complaints by Plaintiff about side effects of any sort, no concerns about side effects by any treating physician, and no treating-physician-imposed limitations upon Plaintiff due to medication side effects. Similarly, the physical consultative examiners made no mention of side effects or imposed any side effect-related restrictions. The only such complaints in the record are those made by Plaintiff in connection with his claim for disability benefits. *See* Holley v. Chater, 931 F. Supp. 840, 850 (S.D. Fla. 1996) (although claimant was questioned at his hearing about the alleged side-effects of prescription medicine, and he responded that the medication made him feel "dizzy and drowsy," this was "the sole evidence in the record to indicate that [claimant] suffered any disabling side-effects from medication" and such "scant evidence [was] insufficient to support a finding of disability").

Even more telling, however, is evidence in the record reflecting that Plaintiff worked from mid-May 2005 through November 2006, and at the same time took the Darvoct or Lortab prescribed by Dr. Fletcher (*see, e.g.*, Tr. 378–80). Indeed, Dr. Fletcher's treatment records from this time frame are the only records in the file that document Plaintiff obtaining treatment and being prescribed narcotic pain medications on a fairly regular basis (*id.*), yet Plaintiff worked at the time he took these medications (and while taking them to the fullest possible extent, as Plaintiff intermittently reported

[10] Although Plaintiff stated on another disability form that Lortab was prescribed by Dr. Bachman in 2007 and/or by Drs. Bachman, Samson and Spencer since December 2006 (*see* n.5, *supra*), the undersigned has found no treatment records from a Dr. Bachman, Samson or Spencer in the file or any records documenting Lortab prescriptions from late 2006 or from 2007 (other than Dr. Caylor's records), and Plaintiff has not identified any such records (*see* Doc. 12 at 2 (scheduling order, advising that "[f]ailure by either party to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development")) (emphasis in original).

to an ER and stated he had run out of the medication prescribed by Dr. Fletcher). Thus, the record establishes that the medications did not affect Plaintiff's ability to work. Moreover, Dr. Fletcher recommended that Plaintiff return to work at a medium level of exertion, with no restrictions related to the use or side effects of medication, at the same time he prescribed Darvocet (and subsequently Lortab), evidencing his belief that such medications did not affect Plaintiff's ability to perform work (*see, e.g.*, Tr. 379–80). The undersigned thus concludes that the ALJ did not err in failing to specifically address or discount Plaintiff's report that his medications made him feel drowsy or caused some other side effect, as Plaintiff produced no evidence in support of a claim that medication side effects render him disabled or otherwise prevent him from working.[11]

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 16th day of July 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

---

[11] Even if the ALJ did err in failing to specifically address or discount Plaintiff's reported medication side effects, any error is harmless. The ALJ evaluated Plaintiff's overall credibility, as discussed *supra*. Moreover, she did so in accordance with the applicable law and regulations (*see* Tr. 20–21), and her credibility findings are substantially supported by the record. For all the reasons previously discussed in this Report, it is of no consequence in this case that the ALJ failed to specifically mention or discount Plaintiff's alleged side effects. *See, e.g.,* Brueggemann, 348 F.3d at 695 (error harmless if ALJ would have reached same decision denying benefits had he followed the proper procedure); Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (reversal and remand based on disregard of a social security ruling may occur only when the plaintiff also shows that prejudice arose from that error). *Cf.* Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990) (no error in ALJ's determination that side effects from medication did not present a significant problem where the record did not disclose any concerns about side effects by the several doctors who examined and treated claimant); Robinson v. Astrue, 365 F. App'x 993, 998 (11th Cir. 2010) ("ALJ properly supported his credibility determination by noting, among other things, that Robinson complained at the hearing about medication side-effects, but that she had not complained of these side effects to her treating physicians").

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**